ÁNGEL SACARELLO BALS, peticionario y apelante, *v.* LA JUNTA DE RETIRO DE LOS FUNCIONARIOS Y EMPLEADOS DEL GOBIERNO INSULAR DE PUERTO RICO, ETC., demandada y apelada.

Número 10574.

*Sometido:* 4 de mayo de 1953. *Resuelto:* 31 de julio de 1953.

*R. Rivera Zayas, G. Rivera Cestero* y *Milton F. Rúa,* abogados
del apelante; *Hon. Secretario de Justicia José Trías Monge*
(*Víctor Gutiérrez Franqui, Exprocurador General,* en el ale-
gato), *José Antonio Arabía* y *A. Torres Braschi, Procura-
dores Auxiliares,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del
tribunal.

A la petición de *mandamus* instada por Ángel Sacarello
Bals contra la Junta de Retiro de los Funcionarios y Emplea-
dos del Gobierno Insular de Puerto Rico, esta última inter-
puso moción eliminatoria y para desestimar por falta de
hechos suficientes para determinar una causa de acción.[1]
Luego de una vista, el tribunal a quo dictó extensa resolu-
ción declarando con lugar la moción desestimatoria y no
siendo, a su juicio, susceptible de enmienda la petición, or-
denó su archivo, con costas al peticionario, pero sin incluir
honorarios de abogado. Presentada moción de reconsidera-
ción, la misma fué declarada sin lugar a virtud de otra ex-
tensa resolución, en la cual el tribunal se ratificó en su
criterio antes enunciado. Fundado en los razonamientos
expuestos en esa resolución dictó sentencia declarando sin
lugar la demanda. El peticionario apeló de esa sentencia
y para sostener su recurso ahora señala doce errores. No es
menester discutirlos detalladamente. Bastará que digamos
que, conforme veremos, la sentencia apelada habrá de ser
confirmada, aunque por motivos distintos a los expuestos por
el tribunal a quo.

La petición de mandamus presentada es sumamente de-
tallada. Ocupa las primeras 19 páginas del legajo de sen-

---

[1] La moción eliminatoria no fué resuelta por el tribunal a quo, pero
las partes no suscitan cuestión alguna a ese respecto.

tencia.   Sus alegaciones esenciales son, en síntesis, que con más de 23 años de anterioridad a la fecha de su separación el peticionario ocupó diversos cargos en el Gobierno Insular de Puerto Rico, ostentando para junio de 1946 el de Jefe de la División de Ingeniería para Muelles y Puertos, adscrito al Departamento de lo Interior, siendo los gastos de esa División sufragados por la Junta del Puerto de San Juan; que por ley de 1946 la Asamblea Legislativa disolvió esa Junta y ordenó el traspaso de sus propiedades y negocios a la Autoridad de Transporte de Puerto Rico; que entonces el Comisionado de lo Interior le designó Ingeniero Encargado de Obras de Puertos, cargo que también era conocido como Jefe de la División de Obras Portuarias, que estaba adscrito al Negociado de Obras Públicas de ese Departamento y que tenía un sueldo anual de $4,500, que luego fué rebajado a $4,000; que en 26 de diciembre de 1946 el Negociado de Presupuesto eliminó, a partir del 30 de abril de 1947, la División de Ingeniería para Obras Portuarias, y por ende, el cargo de Jefe de dicha División que él desempeñaba; que dada la eliminación de esa plaza él quedó cesante y por tener más de 24 años de servicios como empleado permanente y más de 45 años de edad, se acogió a lo dispuesto por la sección 8 de la Ley núm. 23 de 16 de julio de 1935 (Ses. Ext. págs. 127, 135) (²) y solicitó de la Junta demandada

(²) La sección 8 de la Ley núm. 23, supra, preceptúa en lo pertinente: "Si un funcionario o empleado a quien esta Ley sea aplicable, de 45 años de edad, antes de tener derecho a retiro fuere separado involuntariamente por cualquier motivo, excepto destitución del Servicio Civil Clasificado o no clasificado, después de haber servido por un período no menor de veinte (20) años, tendrá derecho a recibir, desde la fecha en que cesare en su cargo, (sic) de un cincuenta por ciento del sueldo que estuviere devengando al tiempo en que cesare en sus funciones oficiales hasta tanto sea repuesto por la Comisión del Servicio Civil en un cargo igual o similar al que desempeñaba, y para lo cual será deber de dicha Comisión, sin excusa ni pretexto alguno, comunicar el nombre de dicho empleado al Jefe del Departamento en que hubiere vacado la plaza y éste deberá nombrar al citado empleado para la referida vacante.   Si el empleado así nombrado declinare dicho nombramiento, cesará *ipso facto* la pensión que percibe y la Junta de Retiro procederá a dar de baja su nombre de la nómina de los pensionados; . . . ."

que le certificara la pensión correspondiente por separación
involuntaria, a lo cual ella accedió, concediéndole una pen-
sión de $2,000 anuales; que en 22 de enero de 1948 la Divi-
sión de Personal y Estadísticas de la Oficina de Personal le
comunicó que su nombre había sido certificado al Comisio-
nado de lo Interior para el puesto de Ingeniero Civil IV, con
un sueldo de $400 mensuales, que siendo él la única persona
certificada para dicho puesto ese Departamento venía obli-
gado a nombrarle, y que de no aceptar ese nombramiento la
Junta de Retiro sería notificada a los efectos de ley; que
en 4 de febrero de 1948 el Comisionado de lo Interior se
dirigió al Director de la Oficina de Personal afirmando que
las plazas de Ingeniero Civil IV y la de Ingeniero Jefe de
la División de Puertos y Muelles eran en todo respecto com-
pletamente disímiles;[3] que en 7 de abril él fué notificado
por el Oficial Administrativo de aquel Departamento que la
Junta de Personal (sic) había ratificado la certificación del
peticionario para el cargo de Ingeniero Civil IV y que debía
presentarse el día 12 a tomar posesión; que en respuesta él
se dirigió al Departamento de lo Interior alegando que el
cargo de Ingeniero Civil IV no era igual ni similar al que
ocupaba de Jefe de la División de Obras Portuarias al mo-
mento de su cesantía; y que en 15 de abril la Junta de Retiro
le informó que su nombre había sido eliminado de la lista
de pensionados a partir del primero del mismo mes;[4] que
en 28 de mayo él dirigió por conducto de sus abogados una
extensa comunicación a la Junta de Retiro informándole
todo lo anterior y solicitando se le restituyera la pensión que
venía percibiendo, que se dejara sin efecto la resolución dán-
dole de baja y que, en todo caso, se le concediera la oportu-
nidad de una audiencia administrativa ante ella para expo-
ner su caso; que en 13 de octubre fué notificado por la Junta

---

[3] En la petición se copia literalmente la carta en cuestión.
[4] En la demanda se copia también al pie de la letra la carta diri-
gida por la Junta querellada al peticionario.

de que su petición había sido por ella considerada, de que su decisión era concluyente al efecto de suspenderle la pensión y de que no creía necesaria la comparecencia de sus abogados.

Continúa alegándose en la petición que en la comunicación dirigida por el peticionario a la Junta demandada en 28 de mayo se adujo que él nunca había recibido nombramiento alguno para un cargo igual o similar al que desempeñaba al momento de ser retirado del servicio; que nunca se le había expedido nombramiento para cargo alguno y que en todo caso que se le hubiera expedido el nombramiento de Ingeniero Civil IV, el mismo era nulo, inoficioso y sin efecto legal alguno para afectar la pensión del peticionario "toda vez que dicho cargo de Ingeniero Civil IV no es un cargo igual o similar al de Jefe de la División de Ingeniería de Obras Portuarias, que él desempeñaba al momento de su separación." Continúa exponiendo la petición los deberes y responsabilidades del cargo de Ingeniero Civil IV y los de la plaza de Jefe de Ingeniería de Obras Portuarias, [5] y que durante sus 24 años de servicios al Gobierno de Puerto Rico cotizó siempre al Fondo de Retiro. Concluye la petición alegando que la Junta querellada erró al suspenderle la pensión: (1) porque a él no se le ha extendido nombramiento alguno igual o similar al que desempeñaba al momento de cesar en su cargo de Jefe de la División de Obras Portuarias del Departamento de lo Interior; (2) porque no se le ha extendido nombramiento alguno como Ingeniero Civil IV; (3) porque en el supuesto de que se le haya extendido un nombramiento para este último cargo el mismo es nulo e ineficaz "toda vez que dicho cargo no es igual o similar al que venía desempeñando . . . al momento de su cesan-

---

[5] Al sostener que dichos cargos no son iguales ni similares, el peticionario copia además en su petición la carta dirigida en 30 de septiembre de 1946 por el Comisionado de lo Interior al Director del Negociado del Presupuesto. En ella se exponen en detalle las funciones principales asignadas a la División de Ingeniería para Obras Portuarias.

tía;" (4) porque la Junta no tuvo ante sí evidencia de índole alguna que justifique la eliminación de su nombre de la lista de pensionados del Gobierno por retiro involuntario; (5) porque la Junta se negó a considerar la oferta de él de sustanciar los hechos consignados en los párrafos anteriores; y (6) porque al darle de baja la Junta no ha cumplido con lo dispuesto en la sección 8 de la Ley 23, ya que él "no ha recibido nombramiento para un cargo igual o similar, así como tampoco ha declinado el peticionario la aceptación de un cargo igual o similar al que desempeñaba al momento de su cesantía como Jefe de la División de Obras y Puertos."

No es necesario exponer detalladamente los razonamientos aducidos por el tribunal sentenciador en sus extensas resoluciones para llegar a la conclusión de que la petición en la forma en que está redactada no aduce hechos determinantes de una causa de acción. La médula de esos razonamientos fué que no hay duda de que era la Comisión de Servicio Civil la que tenía en sus manos el resolver si el peticionario habría de continuar disfrutando de su pensión o si se restituiría al gobierno a que sirvió; que por virtud de la Ley 345 de 12 de mayo de 1947 (pág. 595), creadora de la Oficina de Personal, se abolió dicha Comisión y todos sus records, obligaciones y prerrogativas pasaron a esta última; (6) que era la Oficina de Personal a la que incumbía determinar si la plaza para la cual se habría de reponer al peticionario era una de naturaleza igual o similar a la que éste venía desempeñando a la fecha de su retiro; que el hecho de que el Comisionado de lo Interior discrepase del criterio de la Oficina de Personal en relación con la igualdad o similitud de la plaza para la cual se certificaba al peticionario con la plaza abolida no era decisivo; que la ley daba al peticionario un recurso, o sea pedir la reconsideración a la Oficina de Personal y si tal reconsideración le era dene-

---

(6) Véase la sección 41 de la Ley 345, supra.

gada apelar y obtener una vista ante la Junta de Personal; que nada se hubiera adelantado con la celebración de una audiencia ante la Junta de Retiro; y que el peticionario no había agotado su remedio administrativo.

■ Una moción para desestimar como la presentada en este caso por la demandada tiene el alcance y efecto de la excepción previa dispuesta por el artículo 105 del Código de Enjuiciamiento Civil, es decir, admitir la veracidad de los hechos esenciales de la demanda. *Rivera* v. *Pueblo*, 73 D.P.R. 902; *Boulon* v. *Pérez*, 70 D.P.R. 988; *cf. Sierra* v. *Autoridad de Transporte*, 68 D.P.R. 626; *Acuña* v. *Junta de Retiro*, 58 D.P.R. 94, 100.

■ Aceptando como ciertas las alegaciones esenciales de la petición, ¿aduce ésta hechos determinantes de una causa de acción? Incuestionablemente que no. Pasamos a discutir en seguida por qué contestamos esta pregunta en la negativa.

Según la sección 6 de la Ley núm. 345 de 1947, supra:

"Además de los deberes que se le imponen por otras disposiciones de esta Ley, será deber de la Junta (de Personal):
"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"(6) *Investigar y resolver en apelación* a solicitud de parte controversias surgidas sobre las siguientes materias: *destituciones, suspensiones, cesantías, separación de empleados en el período probatorio, descensos, asignación y reasignación de puestos.* . . .

"*Las decisiones de la Junta serán finales salvo en casos de destituciones, en los cuales podrá acudirse en revisión ante la corte de distrito del distrito donde prestare servicios el empleado destituído.*"([7]) (Bastardillas nuestras.)

_____

([7]) El inciso 6 de la sección 6, supra, fué enmendado por la Ley 406 de 11 de mayo de 1951 (pág. 1075). Ese inciso ahora se lee así:
"Investigar y resolver en apelación, a solicitud de parte, controversias surgidas sobre las siguientes materias: destituciones, suspensiones, cesantías, separación de empleados en el período probatorio *por razones políticas, religiosas o de razas,* y descensos." (Bastardillas nuestras.)
La enmienda consta, como se ha visto, de la adición de las palabras "por razones políticas, religiosas o de razas," y en la eliminación de las palabras "asignación y reasignación de puestos" que figuraban en la ley original.

Es meridianamente claro que el caso del peticionario no es uno de destitución, como tampoco lo es de suspensión, cesantía, separación de empleo durante el período probatorio o de descenso. Se trata posiblemente de la asignación o reasignación de un puesto. En relación con la asignación o reasignación de puestos, por la sección 10 de la Ley 345, supra, se ordena al Director de la Oficina de Personal que previa consulta con las autoridades nominadoras y otros funcionarios dirigentes determine los deberes y responsabilidades de todos los puestos en el Servicio por Oposición y Servicio sin Oposición y que agrupe dichos puestos dentro de clases para constituir un plan de clasificación. Y por la sección 11 de la misma se dispone que "tan pronto como fuere posible, después de la adopción del plan de clasificación, el Director *asignará* cada puesto en el Servicio por Oposición y Servicio sin Oposición a la clase correspondiente," y que "todo empleado afectado por cualquier *asignación* o *reasignación* de un puesto tendrá el derecho de radicar ante el Director solicitud formal de reconsideración, y, si fuere denegada podrá apelar y obtener una audiencia ante la Junta de Personal." (⁸) Así, pues, la citada ley de manera clara y terminante dispone quién habrá de preparar el Plan de Clasificación, quién examinará cada puesto en el servicio por oposición y sin oposición, y el derecho que tiene todo empleado afectado por cualquier asignación o reasignación de un puesto. En su consecuencia, de tratarse de la asignación o reasignación del puesto del peticionario, el llamado a determinar la clasificación a que debía asignarse el cargo para el cual se le certificaba lo era el Director de la Oficina de Personal. Éste resolvió que el cargo ofrecídole al peticionario y el antiguo ocupado por él eran iguales o similares.

---

(⁸) La sección 11, supra, fué enmendada por la Ley 406 de 1951. A virtud de esa enmienda se eliminó el derecho que tenía todo empleado afectado por una asignación o reasignación de puesto a solicitar del Director la reconsideración y, al serle denegada la misma, apelar para ante la Junta de Personal.

Contra esa determinación el único remedio del peticionario lo era, de acuerdo con la letra clara del párrafo segundo de la sección 11(c), radicar ante el Director de Personal una solicitud formal de reconsideración, y si ésta le era denegada apelar y obtener una audiencia ante la Junta de Personal. Nada de eso hizo el peticionario.

Por otra parte, la sección 19 de la Ley 345, supra, estatuye que "El Director (de Personal) establecerá y conservará los *registros de reingreso*, los cuales contendrán los nombres de personas que hubieren sido empleados regulares y que hubieren sido separados de sus puestos por cualquier razón que no fuere mala conducta o falta de su parte," y la sección 26 de la misma que "A solicitud de la Junta de Retiro para empleados del Gobierno Insular y sus instrumentalidades, el Director (de Personal) podrá aprobar, en el caso de un empleado que sea elegible a, o se encuentre percibiendo una anualidad o beneficio por incapacidad ocupacional o no ocupacional, la *reasignación o reingreso* de tal empleado a una plaza en una clase cuya retribución sea igual o mayor que el valor de la anualidad por incapacidad o beneficio a que sea acreedor. . . ."[9] (Bastardillas nuestras.) Empero, cuando de reingresos se trata la ley ni siquiera otorga al empleado o funcionario afectado el derecho a acudir a la Junta de Personal de la actuación del Director al llevar su nombre al registro de reingreso.

En vista de lo anterior, llegamos a la conclusión de que si la actuación del Director de Personal al ofrecer al peticionario el cargo de Ingeniero Civil IV equivalió a la asignación o reasignación de un puesto, el peticionario no agotó su remedio administrativo. *Medina* v. *Hato Rey Realty Co.*, 72 D.P.R. 638, 643. Y de tratarse de un reingreso la actua-

---

[9] La sección 2, inciso 13, de la Ley 345 de 1947 dice que:

" 'Registro de reingreso' significará un registro de personas que han sido empleadas regulares en una clase determinada y que son acreedoras a que sus nombres sean certificados para nombramiento en puestos de la misma clase."

ción del Director de Personal era definitiva.([10])   En uno u otro caso la ley no permite recurrir a los tribunales a ventilar la cuestión, por no tratarse de una destitución.   Es solamente en este último caso que puede acudirse a los tribunales contra las resoluciones que dicte la Junta de Personal.   El hecho de que en los demás casos el empleado o funcionario perjudicado por la actuación del Director de Personal o de la Junta de Personal no pueda acudir a los tribunales en solicitud de un remedio no resulta contrario al debido proceso de ley, ya que nadie tiene un derecho adquirido a desempeñar un cargo público.   Ello constituye un privilegio.   *Ramspeck* v. *Trial Examiners Conference*, 345 U.S. 128; *Goldway* v. *Board of Higher Education*, 37 N.Y.S.2d 34; *Reese* v. *Dempsey*, 152 P.2d 157, 163; *Butterworth* v. *Boyd*, 82 P.2d 434, 126 A.L.R. 838; *McAuliffe* v. *New Bedford*, 155 Mass. 216, 220.   *Cf. Estep* v. *United States*, 327 U.S. 114, 120; *Fitzgerald* v. *Douds*, 167 F.2d 714, 717.

■ Pone gran énfasis el peticionario en su contención de que a él no se le extendió nombramiento alguno para el cargo de Ingeniero Civil IV.   No hay duda de que de acuerdo con la sección 8 de la Ley 23, supra, un empleado jubilado bajo las condiciones en que él lo fué tiene derecho a recibir su pensión hasta que sea repuesto por la Comisión del Servicio Civil (hoy en día Oficina de Personal) en un cargo igual o similar al que desempeñaba al momento de acogerse al retiro.   Tampoco la hay de que es el deber de dicha Oficina comunicar el nombre del empleado así jubilado al Jefe del Departamento en que vacare la plaza, de que éste *deberá nombrar* al citado empleado jubilado para la vacante existente, ni de que, "si el empleado *así nombrado* declinare dicho nombramiento, cesará *ipso facto* la pensión que' percibe, etc." (Énfasis nuestro.)   Empero, surge de las alegaciones de la demanda que la División de Personal y Estadísticas de la Oficina de Personal comunicó al peticio-

---

([10]) Lo mismo sucede si meramente se trata de una reposición.

nario por carta de 22 de enero de 1948 que su nombre había sido certificado al Comisionado de lo Interior para el puesto de Ingeniero Civil IV y que en esa carta se le decía que en cumplimiento de la ameritada ley "el peticionario era la única persona certificada para el puesto referido y el Departamento de lo Interior vendría obligado a nombrarle en tal cargo." También surge de la demanda que en 7 de abril del indicado año el peticionario fué notificado por el Oficial Administrativo del Departamento de lo Interior de que la Junta de Personal (*sic*) había ratificado la certificación de referencia, que "el peticionario debía presentarse el 12 de abril a tomar posesión de dicho cargo" y que "el peticionario escribió al Departamento del Interior expresando en contestación a dicha carta . . . que el aludido cargo de Ingeniero Civil IV no era igual ni similar al cargo que él ocupaba . . . al momento de su cesantía, y que entre esas plazas no había similitud alguna."

La citada carta del Oficial Administrativo no equivalió en forma alguna a una delegación de la facultad de hacer los nombramientos que en relación con los empleados y funcionarios subalternos de su departamento tenía el Comisionado de lo Interior.[11] En ella no se le extendió al peticionario nombramiento alguno para el cargo de Ingeniero Civil IV. Meramente se le decía que se presentara el 12 de abril del mismo año a tomar posesión de dicho cargo. Una carta concebida en semejantes términos podía redactarla y dirigirla, desde luego, dicho Oficial. Su contenido era una mera rutina oficinesca que podía ser efectuada por cualquier empleado o funcionario subalterno del jefe de dicho departamento, siempre, por supuesto, que estuviera autorizado para ello. Aquí no hay contención alguna de que el Oficial Administrativo no estuviera autorizado para escribir là carta que escribió.

---

[11] Decimos tenía porque en la actualidad ese cargo se conoce como "Secretario de Obras Públicas." Véase la Sección 6 del Artículo IV de la Constitución del Estado Libre Asociado de Puerto Rico.

■■ Si bien al resolver sobre la procedencia de una moción para desestimar una demanda por falta de hechos, el deber de la corte no es determinar los méritos finales de la reclamación con el propósito de decidir a quién asiste la razón—si a la parte demandante o a la demandada—sino considerar si a la luz de la situación más favorable al demandante y resolviendo toda duda a su favor, la demanda es suficiente para constituir una reclamación válida—*González v. Hawayek,* 71 D.P.R. 528; *Boulon v. Pérez,* 70 D.P.R. 988—sin embargo, ello no significa que en todo caso en que se presenta una moción para desestimar de esa naturaleza tenga necesariamente que prevalecer la parte demandante. La anterior regla tiene como excepción aquellos casos en que no obstante la liberalidad con que se interpreten las alegaciones de una demanda, el tribunal al estudiar las mismas queda plenamente convencido de que en su etapa final el demandante no habrá de prevalecer. Precisamente es ése nuestro criterio en este caso; es decir, de las propias alegaciones de la demanda, admitidas como ciertas a los fines de la cuestión que nos ocupa, se desprende que el nombre del peticionario fué certificado por la Oficina de Personal para un cargo igual o similar al que él desempeñaba para la fecha de su retiro; que a él se le notificó por escrito de que debería personarse en el Departamento de lo Interior a tomar posesión de dicho cargo; que, según la interpretamos, de haberse presentado el peticionario en el Departamento de lo Interior en la fecha que se le indicaba en dicha notificación, el nombramiento de rigor se hubiera extendido a su favor por el Comisionado de lo Interior; y que al contestar el peticionario en la forma en que lo hizo él rehusó el cargo que se le ofrecía. Decimos lo anterior porque es incuestionable que su nombre fué certificado por la Oficina de Personal al Comisionado de lo Interior para un cargo igual o similar a aquél que tenía al momento de su jubilación involuntaria; porque por disposición expresa del estatuto, al recibir dicho Comisionado la certificación del nombre del

peticionario para el cargo de Ingeniero Civil IV, aquél no tenía otra alternativa que extenderle nombramiento para el mismo—son presunciones en derecho "que los deberes de un cargo han sido cumplidos con regularidad" y "que la ley ha sido acatada", artículo 102, incisos 15 y 32 de la Ley de Evidencia—; porque es de presumirse que si el peticionario se hubiera presentado en el Departamento de lo Interior en 12 de abril de 1948, tal cual se le requería en la carta dirigídale por el Oficial Administrativo, el Comisionado de lo Interior, cumpliendo con el mandato imperativo de la sección 8 de la Ley 23, supra, le hubiese extendido nombramiento para el cargo que se le ofrecía; y porque fué el propio peticionario al dirigirse a dicho Departamento en la forma en que lo hizo, quien declinó dicho nombramiento, por el motivo que aducía. Bajo ese estado de hechos el peticionario jamás podría tener éxito en el recurso por él interpuesto. La realidad es que si el nombramiento requerido por la ley no se extendió a su favor para el cargo de Ingeniero Civil IV, ello se debió única y exclusivamente a la propia actuación del peticionario al declinarlo. Ahora está, por tanto, impedido (*estopped*) de sostener que no se le extendió nombramiento para el cargo para el cual se le certificó, que no lo declinó, y que tiene derecho al remedio que solicita.

El artículo 208 del Código Político no desempeña en este caso papel de importancia alguna. En lo pertinente preceptúa que "queda vacante un cargo al ocurrir cualquiera de los ·siguientes casos, antes de vencerse el período de su duración: (1) La muerte del funcionario o empleado . . . (9) que por denegación o negligencia, no prestare su juramento oficial o fianza dentro de los quince días después de haber principiado el período de su cargo de acuerdo con la ley." Se recordará que en la tantas veces mencionada carta del Oficial Administrativo, fechada el 7. de abril de 1948, se le decía al peticionario que se presentara el día 12 del mismo mes a tomar posesión del cargo de Ingeniero Civil IV. Inne-

gable es que desde la fecha de esa carta hasta aquélla en que debía presentarse Sacarello Bals a prestar juramento no mediaba un término de 15 días, pero el poder nominador puede siempre indicar a la persona nominada la fecha en que ésta debe comparecer a tomar posesión del cargo que se le ofrece, siempre, desde luego, que entre la fecha del nombramiento y la de la toma de posesión no medie un término mayor que el de 15 días. De exceder de ese término habría necesidad de hacerse un nuevo nombramiento. Sin embargo si, como ocurrió en este caso, a la persona nombrada se le fija un término menor del de 15 días para comparecer a tomar posesión, ella es la llamada a manifestar el motivo por el cual no puede acceder a lo interesado por el poder nominador y a solicitar, si así lo desea, que el período completo de 15 días le sea concedido. En este caso, no obstante, el peticionario no solicitó en forma alguna la ampliación del término y por el contrario prontamente contestó a la carta del Oficial Administrativo indicando por qué no tomaría posesión del puesto ofrecídole. Su actuación, sin duda, equivalió a declinar el cargo que se le ofrecía.(¹²)

Sea ello como fuere, contra la Junta de Retiro no procede el remedio interesado, ya que su actuación en este caso se limitó a cumplir con el deber ministerial impuéstole por la sección 8 de la Ley 23 de 1935, supra, al ser notificada por la Oficina de Personal de que el peticionario había declinado aceptar un cargo igual o similar al que desempeñaba al momento de su retiro.

*Por las razones expuestas la demanda no aduce hechos*

(¹²) El artículo 186 del Código Político, según fué enmendado por la Ley 93 de 13 de mayo de 1936 (pág. 491) y por la Ley 14 de 24 de julio de 1952 (Ses. Ext., pág. 75) dispone que ". . . . todos los funcionarios ejecutivos, administrativos y judiciales, y todos los empleados del Gobierno (Insular) de Puerto Rico . . . antes de tomar posesión de sus respectivos cargos o empleos" prestarán y firmarán el juramento que en el mismo figura.

*determinantes de una causa de acción y la sentencia apelada debe ser confirmada.*

---

Opinión disidente del Juez Asociado Señor Negrón Fernández.

El derecho a pensión de un empleado retirado involuntariamente bajo las disposiciones de la sección 8 de la Ley núm. 23 de 16 de julio de 1935 no le puede ser confiscado por mero *fiat* administrativo. Para que se le pueda privar de ese derecho, el Estado tiene que dar cumplimiento estricto a las condiciones que, como requisitos *sine qua non*, establece la referida ley para el cese de dicha pensión. Esas condiciones son las siguientes: (1) Que la Comisión de Servicio Civil (hoy Oficina de Personal, Ley núm. 345 de 12 de mayo de 1947 (1) pág. 595), certifique el nombre del pensionado al Jefe del Departamento en que vacare una plaza *igual o similar* a la que desempeñaba el empleado a la fecha de su retiro involuntario; (2) Que el Jefe de dicho Departamento *nombre* al empleado para dicha vacante; y (3) Que el empleado *así nombrado decline* dicho nombramiento.

El requisito número (1) fué, a mi juicio, cumplido, pues la Oficina de Personal certificó al Comisionado de lo Interior el nombre del peticionario para la plaza de Ingeniero Civil IV, aun cuando se alega que dicha plaza no era una "igual o similar" a la que desempeñaba anteriormente. Esta cuestión no es, a mi juicio, materia sujeta a determinación judicial, háyase o no seguido por el peticionario trámite administrativo previo. Por su carácter eminentemente técnico, el poder legislativo delegó la función de clasificar, asignar y reasignar los puestos en el servicio público al Director de la Oficina de Personal—y, en apelación, a la Junta de Personal, hasta que esa función le fué eliminada por la Ley núm. 406 de 11 de mayo de 1951—y no dió revisión judicial contra esas actuaciones administrativas. Dichas actuaciones, por su naturaleza, no constituyen materia que requiera constitucionalmente revisión judicial. *Estep* v. *United States,*

327 U.S. 114, 90 L. ed. 567; Schwartz, *A Decade of Administrative Law;* 1942–1951, 51 Mich. L. Rev. 775, 837, *cf.* *Board of Governors of the Federal Reserve System* v. *Agnew,* 329 U.S. 441, 91 L. ed. 408. Y aunque la ausencia en un estatuto de disposiciones expresas sobre revisión judicial no impide dicha revisión en casos apropiados, sí la impide en uno como el presente en el que se llama al tribunal a hacer determinaciones técnicas que no son propias del poder judicial y sí, en el ejercicio del poder legislativo delegado, de la agencia administrativa encargada de ello por ley.

El peticionario tenía *status* ante la Comisión de Servicio Civil (Oficina de Personal), derivado de la propia Ley de Retiro, para tener derecho a ser oído ante la Junta de Personal, en revisión administrativa de la determinación técnica hecha por el Director, la cual le fué comunicada oportunamente. Él no acudió ante dicha Junta y ahora desea una revisión judicial, no autorizada por el estatuto, para sustituir la revisión administrativa. No está favorecido, en ese extremo, por la ley. Como pensionado, él no puede tener más derechos, respecto a la clasificación o asignación del puesto para el cual fué certificado, que los derechos que tienen los demás empleados respecto a la clasificación o asignación de los puestos que de hecho desempeñan. Cuando fué aprobada la Ley núm. 23 de 16 de julio de 1935—que impone por su sección 8 a la Comisión de Servicio Civil (Oficina de Personal) el deber de certificar para un cargo "igual o similar" al empleado que disfruta de pensión por retiro involuntario—estaba en vigor la Ley de Servicio Civil, núm. 88 de 11 mayo de 1931 (pág. 535), cuyas secciones 13, 14 y 15 conferían a dicha Comisión la facultad de clasificar, asignar y agrupar los puestos en el servicio público en forma similar a la conferida por la Ley núm. 345 de 1947 al Director de Personal. Al confiar el legislador, por la Ley de Retiro, la determinación de la naturaleza "igual o similar" del cargo para el cual debería ser certificado el empleado retirado involuntariamente, a la Comisión de Servicio Civil,

o sea, a la agencia administrativa autorizada por ley para clasificar los puestos públicos, reconoció como aplicables, para los fines de la Ley de Retiro en cuanto a dicho extremo, las determinaciones técnicas de la Comisión (hoy Oficina de Personal) así como los trámites que la Ley de Servicio Civil (hoy Ley de Personal) pudiera proveer para su revisión, si alguna, integrando de ese modo un sistema racional y coordinado para el funcionamiento eficiente de ese aspecto de la Ley de Retiro, en armonía con el propósito esencial de la Ley de Servicio Civil.

El requisito número (2), a mi juicio, no fué cumplido. El estatuto fija el *deber* de nombrar—ya tenía la facultad para ello—en el *Jefe del Departamento* en que hubiera vacado la plaza. Cuando la Asamblea Legislativa sitúa el poder de nombramiento en un funcionario público, ese poder no es delegable por dicho funcionario, ni puede ejercerse a su nombre por persona otra alguna, a menos que algún estatuto lo autorice a ello expresamente. Tal estatuto no existe en nuestra legislación.

No siendo delegable el poder de nombramiento, que en el caso de autos correspondía al entonces Comisionado de lo Interior, ni autorizando la Ley al Oficial Administrativo de dicho Departamento a extender nombramiento alguno, ni por sí ni a nombre del Comisionado, es evidente que la carta de 7 de abril de 1948 de dicho Oficial Administrativo notificando al peticionario que debía presentarse el 12 de dicho mes "a tomar posesión", no es ni constituye, ni puede ser ni constituir, un *nombramiento* del Comisionado de lo Interior, en el cumplimiento estricto del deber fijádole por la sección 8 de la Ley que nos ocupa, de que *nombrara* al peticionario en el cargo para el cual le fué certificado. A lo sumo, dicha carta podría considerarse como una notificación de la *intención* del Comisionado de extenderle nombramiento el día 12 de abril, según reconoce la propia opinión del Tribunal al afirmar que es de presumirse que en esa fecha el Comisionado "le hubiera extendido nombramiento para el cargo

que se le ofrecía". Pero la sección 8 de la Ley no se cumple con presunciones, ni con el anuncio de sucesos futuros a través de la notificación de la *intención* de nombrar. La ley requiere actos afirmativos consumados tanto de parte de la autoridad nominadora como de parte del empleado pensionado, para que pueda privarse a éste de su pensión. Los hechos alegados en la demanda demuestran incumplimiento, por parte del Comisionado, del deber de nombramiento impuéstole por ley. La magnitud del error en que incurre el Tribunal en su opinión de hoy toma proporciones alarmantes si nos detenemos a pensar que estamos ante una moción para desestimar, y que, pasando por alto las reglas que deben regir el caso en esta etapa del procedimiento, *González* v. *Hawayek*, 71 D.P.R. 528; *Boulon* v. *Pérez*, 70 D.P.R. 988, se interpretan las alegaciones de la demanda en contra del derecho que se reclama, cerrando así las puertas de los tribunales a la oportunidad de corregir una equivocación o de reparar una injusticia.

No habiéndose dado cumplimiento al requisito número (2), es obvio que el requisito número (3) no pudo haberse cumplido. La carta del peticionario de 12 de abril de 1948 no contiene indicio alguno que indique que él *declina* un nombramiento. Si el español ha de entenderse en el significado que las palabras de nuestro rico idioma tienen, la expresión de inconformidad con una cosa que se va a hacer, no equivale a la renuncia en la participación de la cosa una vez hecha. Dicha carta podría caracterizarse, más bien, como una notificación de apelación—erróneamente radicada con el Comisionado—de la decisión del Director de Personal.

Por último, quiero sólo apuntar una razón adicional que a mi juicio justifica la revocación de la sentencia. Bajo las alegaciones de la demanda, la carta del Oficial Administrativo al peticionario requiriéndole que se presentara el día 12 "a tomar posesión" le fué enviada el 7 de abril—cinco días antes. El 15 de abril, ocho días desde que el Oficial Administrativo escribió su carta, la Junta de Retiro tomó acción

eliminando el nombre del peticionario de la lista de pensionados *a partir del primero del mismo mes*, lo cual comunicó a éste en dicha fecha. Independientemente del hecho de que la actuación de la Junta afectó *retroactivamente*—desde el primero de abril—el derecho del peticionario a su pensión, es posible que éste fuera privado de la misma prematuramente y sin autoridad de ley, pues aún en el supuesto de que la carta del Oficial Administrativo constituyera el *nombramiento* que el Comisionado venía obligado a extender bajo la sección 8 de referencia, en ausencia de una comunicación en que el peticionario declinara el mismo, el artículo 208 del Código Político, según enmendado por la Ley de 6 de marzo de 1909 (pág. 145), en relación con el 186, según enmendado por la Ley núm. 93 de 13 de mayo de 1936 ((1) pág. 491)—ambos vigentes en la fecha antes mencionada— le confería un término de quince días para prestar juramento y tomar posesión del cargo, término éste del que se hizo —en el supuesto que indicamos—caso omiso tanto en la carta de 7 de abril al requerírsele que se presentara el 12 "a tomar posesión" como en la de la Junta de Retiro del día 15 de abril al notificársele la eliminación de su nombre de la lista de pensionados.

Los hechos alegados en la demanda son suficientes para establecer causa de acción, llámesele *mandamus, sentencia declaratoria* o simplemente *acción civil*, pues claramente indican (1) que no hubo nombramiento a favor del peticionario; (2) que éste no declinó nombramiento alguno; (3) que en el supuesto que hubiera habido nombramiento, se limitó al peticionario en el término de ley para prestar juramento y tomar posesión del cargo y (4) que se privó al peticionario prematuramente, por la Junta de Retiro, de la pensión que disfrutaba. Si en esas condiciones declaramos que el peticionario no tiene derecho a su día en corte, la regresión en nuestro concepto básico de justicia es evidente.

Opinión disidente del JUEZ ASOCIADO SEÑOR SIFRE.

Convengo con que en el mandamus iniciado contra la Junta de Retiro no puede discutirse la cuestión relativa a la igualdad o similitud de los cargos. Disiento, sin embargo, de la conclusión al efecto de que la demanda no aduce hechos constitutivos de causa de acción. La demanda no ha debido ser desestimada por ese motivo en vista de que en ella se alega que el peticionario no fué nombrado para cargo alguno. La veracidad de esa alegación quedó admitida para los efectos de la moción de desestimación. La conclusión a que llega el tribunal de que el peticionario declinó el cargo de Ingeniero Civil IV e impidió que se le nombrara para ese puesto, se basa en que dicho peticionario, al ser notificado por el Jefe Administrativo del Departamento de lo Interior para que se presentara a tomar posesión, contestó que "el cargo de Ingeniero Civil IV no era igual ni similar al cargo que él ocupaba . . . al momento de su cesantía, y que entre estas plazas no había similitud alguna". Esa manifestación no es susceptible de la sola y única interpretación que le da la mayoría, a saber, que constituye una declinación del nombramiento. En vista de la alegación sosteniendo que el peticionario no fué nombrado para ningún cargo, y considerando que lo manifestado por el peticionario al Jefe Administrativo del Departamento de lo Interior no excluye, como cuestión de derecho, otra interpretación distinta a la que le da el tribunal, el efecto legal de la misma ha debido ser determinado después de oír la prueba, y con conocimiento de todas las circunstancias.

Es doctrina general que al resolver sobre la validez de una moción para desestimar por falta de hechos, el deber de la corte es decidir si "a la luz de la situación más favorable al demandante y resolviendo toda duda a favor de éste, la demanda es suficiente para constituir una reclamación válida". La decisión de la mayoría es contraria a esa doctrina, que fué objeto de nuestra sanción en *Boulon* v. *Pérez*, 70 D.P.R. 988. La duda (me refiero al alcance de lo mani-

festado por el peticionario al Jefe Administrativo del Departamento de lo Interior), ha sido resuelta en contra del peticionario.

Independientemente de esa doctrina, nos parece evidente que a nadie debe privársele de la pensión, a no ser que claramente quede demostrado que ha perdido su derecho a ella. Las leyes que conceden el derecho a disfrutarla, deben ser interpretadas liberalmente, para que se cumpla el propósito del legislador. *Acuña* v. *Junta de Retiro*, 58 D.P.R. 94, 97.

Al confirmarse la sentencia apelada se priva al peticionario de su pensión, dejándolo huérfano de todo remedio. A ese resultado se llega resolviendo en su contra toda posible duda surgente de sus alegaciones y dándole a la ley que crea el derecho al disfrute de pensión una interpretación ultra restrictiva en sentido adverso al peticionario.

---

Opinión disidente del JUEZ ASOCIADO SEÑOR BELAVAL.

No estoy conforme con la ilustrada opinión rendida por el compañero Juez Asociado señor Marrero, y aunque concurro en los resultados con las ilustradas opiniones disidentes rendidas por los compañeros Jueces Asociados señores Negrón Fernández y Sifre, tengo algunos fundamentos adicionales para disentir que me obligan a formular por separado, mis objeciones a la opinión de la mayoría.

Los hechos jurídicos, o sea, aquellos hechos extraídos de la totalidad de la prueba sobre los cuales se basa la decisión judicial son los siguientes: (1) el 26 de diciembre de 1946, el Negociado de Presupuesto de Puerto Rico eliminó la División de Ingeniería para Obras Portuarias cuya Jefatura desempeñaba el peticionario; (2) por tener el peticionario 24 años de servicio como empleado permanente y más de 45 años de edad, se jubiló bajo las disposiciones de la sección 8 de la Ley número 23 de 16 de julio de 1935 (Ses. Extraordinaria, pág. 127); dicha sección 8 dispone que el jubilado "tendrá derecho a recibir, desde la fecha en que cesare en su cargo, de un cincuenta por ciento del sueldo que estuviere devengando al tiempo en que cesare en sus funciones,

oficiales hasta que sea repuesto por la Comisión de Servicio Civil *en un cargo igual o similar* al que desempeñaba, y para lo cual será deber de dicha Comisión, sin excusa ni pretexto alguno, comunicar el nombre de dicho empleado al Jefe del Departamento en que hubiere vacado la plaza y éste deberá nombrar al citado empleado para la referida vacante; si el empleado así nombrado declinare dicho nombramiento, cesará *ipso facto* la pensión que percibe y la Junta de Retiro procederá a dar de baja su nombre de la nómina de los pensionados"; (3) que en 22 de enero de 1948 la División de Personal y Estadísticas de la Oficina de Personal le comunicó al peticionario que su nombre había sido certificado al Comisionado de lo Interior para el puesto de Ingeniero Civil IV y que siendo él la única persona certificada para dicho puesto ese departamento venía obligado a nombrarle, y que de no aceptar ese nombramiento la Junta de Retiro sería notificada a los efectos de ley; (4) que el día 4 de febrero de 1948, el Comisionado de lo Interior se dirigió al Director de la Oficina de Personal afirmando que las plazas de Ingeniero Civil IV y la de Ingeniero Jefe de la División de Puertos y Muelles, que era la que ocupaba originalmente el peticionario *eran en todo respecto completamente disímiles;* (5) que en 7 de abril de 1948 el peticionario fué notificado esta vez por el Oficial Administrativo del Departamento de lo Interior, que habiendo rechazado la Junta de Personal las objeciones del Comisionado de lo Interior, debía presentarse *el 12 de abril de 1948* a tomar posesión de su nuevo cargo; (6) que el peticionario contestó la carta del Oficial Administrativo, alegando que el puesto que se le ofrecía *no era igual o similar* al puesto que él desempeñaba al momento de producirse su cesantía; (7) que por toda contestación ulterior recibió el 15 de abril de 1948, una comunicación de la Junta de Retiro, notificándole que su nombre había sido eliminado de la lista de pensionados a partir del 1ro. de abril de 1948.

Obsérvese que la certificación de la nueva plaza la hace el Director de Personal sin darle una oportunidad de ser

oído al peticionario, a pesar que dicho peticionario es un pensionado, con ciertos derechos concedidos por la sección 8 de la Ley número 23 de 16 de julio de 1935, y no un empleado, propiamente dicho; que la única discusión sobre la igualdad o similitud de los dos puestos concernidos se realiza entre el Comisionado de lo Interior, poder nominador y el Director de Personal, sin que se le brinde oportunidad alguna al peticionario de ser oído en la adjudicación administrativa de dichos derechos; que cuando el Director de Personal deniega las objeciones del Secretario de lo Interior, lo único que se le comunica al peticionario es su obligación de comparecer ante el poder nominador a tomar posesión de un cargo; que cuando él objeta ante el poder nominador que el nuevo cargo *no es igual o similar* al que desempeñaba, lo único que recibe, es una resolución de la Junta de Retiro, otra entidad distinta, notificándole que su nombre ha sido eliminado de la lista de pensionados. Para mi este es un caso típico de la confiscación de un derecho sin debido proceso de ley. Cuando un pensionado cree que el puesto para el cual ha sido certificado no es igual o similar al puesto que desempeñaba al momento de jubilarse, la Junta de Retiro debe celebrar una vista antes de disponer definitivamente de la pensión del jubilado, pues la ley condiciona su obligación de reintegrarse al servicio público, a que el nuevo puesto *sea igual o similar* al que desempeñaba el jubilado. La determinación que el puesto es de igual o similar categoría o que el pensionado, al ofrecérsele un puesto de igual o similar categoría rehusa ocuparlo, corresponde a la Junta de Retiro y es este último organismo el que tiene que cumplir con el debido proceso de ley.

Creo que uno de los deberes ineludibles de la magistratura es mantener en el mayor grado de certeza posible aquellas interpretaciones de la ley que han de convertirse, tarde o temprano, en normas judiciales uniformes. A veces no es posible dentro de las cambiantes situaciones que se producen en la ciencia del derecho, establecer una regla judicial uni-

forme, y la decisión judicial tiene que circunscribirse a los méritos de la cuestión litigiosa. A veces, por el contrario, se puede establecer una regla uniforme que sirva de índice mínimo a los tribunales sentenciadores y a los abogados del foro.

Este es un caso donde se plantea esencialmente la autoridad del "poder judicial" para intervenir con la decisión de una agencia administrativa, cuando el estatuto concernido guarda silencio sobre una posterior revisión judicial. La cuestión es lo suficiente conflictiva en nuestra jurisprudencia actual, para que podamos mantenernos al margen de ella, formulando una simple negativa.

La adjudicación administrativa de ciertas cuestiones que tradicionalmente se resolvían en los tribunales de justicia, es una delegación de autoridad legislativa. Los organismos administrativos, tal y como hoy los conocemos, son esencialmente agencias de la rama legislativa del gobierno. Es constitucionalmente válido que las legislaturas hagan por sí mismas, o deleguen en ciertos organismos creados para tales fines, cualesquiera funciones propiamente legislativas. La práctica democrática ha demostrado, que en algunos aspectos de la función legislativa, tales como aprobación de tarifas para servicios públicos, regulación de franquicias públicas, adopción de escalas uniformes de salarios, clasificación de servidores públicos, control de precios, era necesario la creación de ciertos organismos legislativos que pudieran desempeñar, dentro de una mejor situación y mayor tiempo, las funciones tradicionalmente encomendadas a la rama legislativa. También la práctica democrática ha demostrado, que para el ajuste de su sistema contributivo, la planeación integral de los recursos económicos, la regulación de algunas acciones particulares que afectan decisivamente la economía de subsistencia, es preferible la creación de una serie de organismos especializados, cuyas conclusiones sobre hechos técnicos, puedan ser superiores a las que podría extraer de la misma cuestión litigiosa, los tribunales tradicionales.

Cuando se trataba de agencias legislativas y no de organismos constitucionales las legislaturas para no confligir con las limitaciones constitucionales impuestas al poder legislativo, adoptaron dos diseños intercambiables: (1) concesión de una revisión posterior por la rama judicial, en aquellos casos en que pudieran existir, dentro de la adjudicación administrativa, adjudicación de derechos individuales justiciables y (2) declaración de finalidad en aquellos aspectos técnicos de la prueba que hubiera podido reglamentar la propia rama legislativa. Con ésto las legislaturas delegaron parte del poder legislativo, para lo cual tenían poder constitucional, y no delegaron ninguna parte del poder judicial para lo cual no hubieran tenido poder constitucional. Esta simple fórmula de la sabiduría legislativa es difícil de aprehender dentro del calenturiento debate que se produce en torno a la adjudicación administrativa de los derechos justiciables (*justiciability*). De esta fórmula de sabiduría legislativa se producen tres tipos de estatutos: (1) los que conceden expresamente revisión judicial; (2) los que guardan silencio sobre revisión judicial, y (3) los que declaran finales las conclusiones de hechos técnicos de los tribunales administrativos.

1. Cuando se trata de un estatuto que concede revisión judicial posterior al trámite administrativo, los tribunales tienen poder para las siguientes declaraciones judiciales: (1) declaración de nulidad de la adjudicación administrativa por una aplicación errónea de la ley, bien sea de naturaleza sustantiva o de procedimiento: *Interstate Commerce Commission* v. *Union Pac. R. R. Co.* 222 U.S. 541, 547, 56 L. ed. 308, 311 (Lamar) (1912); (2) declaración de nulidad de la adjudicación administrativa, aunque se pretenda presentar como una simple cuestión de hecho, cuando en realidad de derecho, los aspectos factuales están tan entrañados dentro de la aplicación de la ley, que de mantenerse la cuestión de hecho escuetamente equivaldría a violentar la supremacía de la ley: compárese *Kansas City So. Ry. Co.* v. *C.*

*H. Albers Commission Co.* 223 U.S. 573, 591, 56 L. ed. 556, 566, (*Van Devanter*), (1912), con *Cedar Rapids Gas Light Co.* v. *Cedar Rapids* 223 U.S. 655, 668, 669, 56 L. ed. 594, 604, (*Holmes*) (1912); (3) declaración de nulidad de la adjudicación administrativa por carencia de conclusiones suficientes para sostener la misma; *Florida* v. *United States* 282 U. S. 194, 212, 215, 75 L. ed. 291, 302–304, *Hughes*) (1931); (4) declaración de nulidad de la adjudicación administrativa porque la conclusión correspondiente no está sostenida por la prueba que tuvo ante sí el tribunal administrativo; *Akron C. & Y. R. Co.* v. *United States* 261 U.S. 184, 203, 67 L. ed. 605, 615, (*Brandeis*), (1923); (5) declaración de nulidad de la adjudicación administrativa porque la conclusión correspondiente resulta incompatible con las correctas inferencias de la prueba; *San Diego Land & Town Co.* v. *Jasper* 189 U.S. 439, 442, 47 L. ed. 892, 894, (*Holmes*), (1903); (6) declaración de nulidad de la adjudicación administrativa porque la evidencia sobre la cual se basa no es evidencia reconocida por la ley; *United States* v. *Abilene & S. Ry. Co.* 265 U. S. 274, 286–290, 68 L. ed. 1016, 1021–1023, (*Brandeis*), (1924); (7) declaración de nulidad de la adjudicación administrativa por exclusión de ciertos hechos y circunstancias que han debido ser considerados antes de la conclusión correspondiente; *Interstate Commerce Commission* v. *Northern Pac. Ry. Co.* 216 U. S. 538, 544, 545, 54 L. ed. 608, 609, (*Holmes*), (1910); *Northern Pac. Ry. Co.* v. *Department of Public Works* 268 U. S. 39, 44, 69 L. ed. 836, 840, (*Brandeis*), (1925); (8) declaración de nulidad de la adjudicación administrativa por inclusión de ciertos hechos y circunstancias que no han debido ser considerados para establecer la conclusión correspondiente; *Interstate Commerce Commission* v. *Diffenbaugh* 222 U. S. 42, 46, 47, 56 L. ed. 83, 87, 88 (*Holmes*), (1911); *Florida East Coast Ry. Co.* v. *United States* 234 U. S. 167, 187, 58 L. ed. 1267, 1272, (*White*), (1914); (9) y la más importante de todas, declaración de nulidad de la adjudicación administra-

tiva por ser confiscatoria, desde un punto de vista constitucional; *St. Joseph Stock Yards Co.* v. *United States* 298 U. S. 38, 50–52, 80 L. ed. 1033, 1041–1042, (*Hughes* ponente, Roberts concurrente, Brandeis concurrente con opinión separada, Stone y Cardozo concurrentes en los resultados), (1936). El repertorio doctrinal arriba transcrito hasta el número 8 está tomado de la opinión concurrente del Juez Brandeis en el caso de *St. Joseph Stock Yards* v. *United States*, supra, cita precisa a la página 1053 L. ed.

2. Cuando se trata de un estatuto que guarda silencio sobre revisión judicial posterior, no debe interpretarse dicho silencio en el sentido que niega "el poder de las cortes . . . . . , a conceder un remedio en el ejercicio de la jurisdicción general que . . . se les ha conferido." *Estep* v. *United States* 327 U. S. 114, 571, 90 L. ed. 567, 571, (Douglas ponente, Murphy, concurrente con opinión separada, Rutledge, concurrente con opinión separada, Frankfurter, concurrente en el resultado con opinión separada, Burton y Stone disidentes con opinión de Burton), (1946), y por el contrario, debe interpretarse como que "la responsabilidad de determinar los límites de la concesión de autoridad a las agencias administrativas es una función judicial encomendada a los tribunales . . . y por aquellos estatutos que establecieron dichos tribunales y fijaron su jurisdicción" *Stark* v. *Wickard* 321 U. S. 288, 307–309, 88 L. ed. 733, 747, (Reed ponente, Black concurrente sin opinión, Frankfurter disidente con opinión) (1944). En cuanto a cualquer posible lesión de un derecho constitucional, el lenguaje utilizado por el Juez Concurrente Murphy, en *Estep* v. *United States*, supra, cita estricta a las páginas 127–129 U. S. 575–576 L. ed. 1 (1946) : "dentro de nuestro sistema no hay ningún fundamento para sostener el punto de vista que el poder judicial de una corte con competencia puede ser circunscrito por algún diseño legislativo que pretenda darle autoridad a la adjudicación administrativa por encima de las limitaciones impuestas por la constitución", no deja lugar a dudas en cuanto a la obliga-

ción de los tribunales tradicionales, de intervenir en cualquier momento en favor de una parte, a quien se le pueda haber lesionado un derecho constitucional.

3. En cuanto a los estatutos que declaran finales las conclusiones de hechos técnicos de las agencias administrativas, no deben interpretarse en el sentido que también declaran finales las conclusiones de derecho. Es bueno recordar que dichas agencias actúan como verdaderos organismos legislativos para establecer los hechos sobre los cuales deben aplicarse los ·patrones mínimos de un estatuto. En vez de incorporarlos al estatuto en la forma tradicional, las legislaturas delegan en organismos administrativos la investigación de dichos hechos técnicos. Pero por la misma razón que la legislatura no tendría poder constitucional para aprobar un estatuto confiscatorio, tampoco tendría poder para delegar en un organismo administrativo facultades para concluir derechos en una forma que resultara confiscatoria; *Gegiow* v. *Uhl,* 239 U. S. 3, 9, 60 L. ed. 114, 118 (*Holmes*) (1915), *St. Joseph Stock Yards Co.* v. *United States* 298 U. S. 38, 52, 80 L. ed. 1033, 1041, (*Hughes*) (1936), *Estep* v. *United States* (Murphy concurriendo), cita estricta a la página 576: "un resultado contrario ciertamente no puede ser dictaminado por el hecho que la ley declare las decisiones de las juntas locales *finales*, sujetas a apelaciones administrativas exclusivamente. Esto meramente determina la finalidad dentro del procedimiento administrativo, propiamente dicho, pero dejando abierto a los tribunales tradicionales su ordinaria obligación histórica de pasar sobre la validez de las adjudicaciones administrativas finales . . . ." *Estep* v. *United States,* supra, cita precisa a la página 572.

Pero bien se trate de estatutos que concedan expresamente revisión judicial, o que guarden silencio sobre revisión judicial, o que declaren finales las adjudicaciones administrativas, es claro, que ni las legislaturas por sí mismas, ni los organismos administrativos que tienen facultades delegadas por las legislaturas, por ellos mismos, pueden

diseñar un sistema mediante el cual un derecho privado pueda ser confiscado sin el debido proceso de ley: *Joint Anti-Fascit Refugee Com.* v. *McGrath* 321 U. S. 124, 149–151, 162–164, 164–165, 177–179, 95 L. ed. 818, 842, 849, 850, 857 (Burton ponente, Douglas conforme con la ponencia, Black concurrente con opinión separada, Frankfurter concurrente con opinión separada, Jackson con opinión separada, Reed, Vinson y Minton disidentes con opinión separada propuesta por Reed) (1951); *Estep* v. *United States*, supra, cita estricta página 576 (L. ed.); *Garfield* v. *United States Ex Rel Goldsby* 211 U. S. 249, 262, 53 L. ed. 169 (Day) (1908) cita precisa a la página 175 (L. ed.).

En el caso de *Joint Anti Fascit Refugee Com.* v. *McGrath*, supra, la opinión concurrente del Juez Félix Frankfurter contiene una de las mejores exposiciones del concepto moderno del debido proceso de ley: el debido proceso de ley, "por representar una profunda actitud de solidaridad humana entre un hombre y otro hombre, o entre un hombre y su gobierno, es un concepto donde se combinan la historia, la razón, los precedentes judiciales y la insobornable confianza en el poder de nuestra concepción democrática de la vida. No puede considerarse como un instrumento mecánico, ni como una dimensión invariable. Es un delicado proceso de ajuste que requiere discernimiento de aquellos a quienes la constitución ha confiado la valoración del proceso . . ." cita precisa a la pág. 849 L. ed. Este Tribunal no está solo en la contienda que el derecho a ser oído antes de ser despojado de cualquier derecho, aunque tal derecho no envuelve el estigma y las vicisitudes de una sentencia penal, es un principio básico de nuestra sociedad. El mismo respeto por el principio ha demostrado tanto el Congreso como el Ejecutivo. Algunas veces el Congreso, porque podía hacerlo, ha preferido confiar la protección de los derechos estatuídos a agencias administrativas en vez de confiarlos a los tribunales. Pero raras veces ha autorizado a dichas agencias a actuar fuera de las seguridades esenciales de aquella conducta que

en el transcurso de los siglos ha estado unida a nuestra concepción del debido proceso de ley . . . y cuando el Congreso le ha conferido a una agencia administrativa discreción para establecer sus propios procedimientos, raras veces dicha agencia se ha decidido a disponer de un derecho individual, sin una oportunidad de ser oído, no importa la informalidad adoptada para la audiencia. ¡La sustancia vital de esta actitud es que la democracia lleva implícita en si misma el respeto por los derechos más rudimentarios del hombre, no importa lo sospechosa y deleznable que pueda parecernos su conducta; un gobierno democrático tiene que inspirarse siempre en el trato justo, y un trato justo rara vez podrá lograrse a través de un procedimiento secreto, unilateral, para decidir sobre los hechos decisivos del caso", cita precisa a las páginas 852 y 853 L. ed.

El *mandamus* ha cumplido en acciones civiles una función parecida a la que ha cumplido el hábeas corpus en acciones penales. Su flexibilidad lo ha salvado del desuso en distintas épocas del derecho. Históricamente considerado, fué un mandato (*writ*) de la corona contra los abusos de los tribunales feudales. Pasa al derecho angloamericano como un remedio contra la inercia o los abusos de discreción de los funcionarios públicos. Cuando aparecen las agencias administrativas con autoridad delegada por las legislaturas para completar la confección de la ley, su utilidad en vez de disminuir, aumenta: Vide: *Mandamus to Review State Administrative Action*—Foster H. Sherwood—45 Mich. L. Rev. 123 (1946). Tan pronto se termina la adjudicación administrativa (*primary administrative jurisdiction*), el *mandamus*, como recurso extraordinario de naturaleza judicial, entra en acción.

El auto de *mandamus* procede para controlar cualquiera actuación administrativa de un funcionario sin autoridad legal para ello. *Garfield* v. *United States Ex Rel. Goldsby*, supra, escolio a la pág. 211 L. ed.; *Drummey* v. *State Board of Funeral Directors 87* P.2d 848, (*Waste*) (1939), cita

precisa a la página 853. El *mandamus* se utiliza para revisar cualquiera deficiencia en el debido proceso de ley que resulte de la actuación de una comisión de servicio civil contra los derechos de un empleado público: *Handlon* v. *Belleville* 71 A.2d 624, 16 A.L.R. (2d) 1118, (*Heher*), (1950), cita precisa a la página 1122; *McFeely* v. *Board of Pension Com'rs of City of Hoboken*, 62 A.2d 686, (*Heher*), (1948), cita precisa a la página 689.

La deseabilidad de estas agencias administrativas, a cargo de algunas funciones técnicas del arte de gobernar, es demasiado evidente, para que pretendamos coartar su actuación haciendo uso de algunos prejuicios orgánicos de la conciencia judicial. Pero ello no implica que debamos inhibirnos en el cumplimiento de deberes constitucionales indeclinables. Uno de ellos es vigilar que la actuación administrativa no se nos convierta en un sistema confiscatorio donde puedan naufragar los derechos individuales.